# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
## WINSTON-SALEM DIVISION

### Civil Action No: 1:15-cv-599

FREDDIE WAYNE HUFF, II,          )
                                      )

    Plaintiff,                     )

v.                                          )
                                      )

NORTH CAROLINA DEPARTMENT OF    )
PUBLIC SAFETY, an agency of North      )
Carolina; DIVISION OF STATE HIGHWAY  )
PATROL, a principal subunit of an agency of )
the State of North Carolina; FRANK L.     )
PERRY, in his official capacity as Secretary of )
the Department of Public Safety and      )
individually; WILLIAM J. GREY, in his    )
official capacity as Commanding Officer of the )
Division of State Highway Patrol and      )
individually; JENNIFER A. HARRIS, in her  )
official capacity as the Director of Professional )
Standards for the Division of State Highway  )
Patrol and individually; and JOSEPH A.    )
COTTON, in his official capacity as the    )
Director of Internal Affairs with the Division of )
State Highway Patrol and individually,    )
                                         )

      Defendants                 )
                                         )
                                         )

## CIVIL COMPLAINT
## (JURY TRIAL DEMANDED)

**TABLE OF CONTENTS**

TABLE OF CONTENTS ...............................................................................................i

NATURE OF ACTION ............................................................................................ 1

JURISDICTION AND VENUE .............................................................................. 4

PARTIES ................................................................................................................. 4

ADMINISTRATIVE PROCEDURES .................................................................... 6

FACTUAL BACKGROUND ................................................................................. 8

CLAIMS FOR RELIEF ........................................................................................ 16

    A.   FIRST CLAIM FOR RELIEF: EQUAL PROTECTION - DISPARATE
         TREATMENT ..................................................................................... 16

    B.   SECOND CLAIM FOR RELIEF: VIOLATION OF PROCEDURAL DUE
         PROCESS .......................................................................................... 23

    C.   THIRD CLAIM FOR RELIEF: VIOLATION OF SUBSTANTIVE DUE
         PROCESS .......................................................................................... 27

    D.   FOURTH CLAIM FOR RELIEF: VIOLATIONS OF 42 U.S.C. §1983 ............... 32

    E.   FIFTH CLAIM FOR RELIEF: SUPERVISORY VIOLATIONS OF 42 U.S.C.
         §1983 (AGAINST SUPERVISORY    DEFENDANTS IN THEIR INDIVIDUAL
         CAPACITY) ........................................................................................ 35

    F.   SIXTH CLAIM FOR RELIEF: CONSPIRACY IN VIOLATION OF 42 U.S.C.
         §1983 (AGAINST ALL DEFENDANTS, AGAINST SUPERVISORY
         DEFENDANTS IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES) ...... 37

    G.   FIFTH CLAIM FOR RELIEF: WRONGFUL DISCHARGE IN VIOLATION OF
         PUBLIC POLICY ................................................................................. 38

Case 1:15-cv-00599-CCE-JEP   Document 1   Filed 07/22/15   Page 2 of 46

PRAYER FOR RELIEF .................................................................................................... 42

ii

## **NATURE OF ACTION**

1.  This is a civil action for damages and injunctive relief under the First and Fourteenth Amendments to the United States Constitution; Article I, §§1, 19, 35, and 36 of the North Carolina State Constitution; as well as 42 U.S.C. §1983; and North Carolina State and Common Law; arising from the unjust, arbitrary and capricious discipline and termination of a North Carolina State Trooper arising from political patronage but given the pre-textual cause of the sale of state-issued shoes.

2.  From March 16, 2014 to the present, Defendants, individually and in concert or conspiracy, have, with deliberate or reckless indifference, disciplined and terminated a State Trooper without a complete investigation, with charges utterly unsupported by the information received in the incomplete investigation, and without due process.

3.  Plaintiff is informed and believes that this unjust and unreasonable termination arises from a Driving While Impaired stop involving a politically-connected individual, an individual who threatened Plaintiff's job should he be charged. Plaintiff performed his duty as a State Trooper, field-testing and charging the individual for Driving While Impaired. Less than twenty-five days later, Plaintiff was terminated from the North Carolina Department of Public Safety, Division of State Highway Patrol. Plaintiff was informed and believes that the order for his

-1-

termination came from outside the Highway Patrol, outside of normal Highway Patrol procedure.

4.  Defendants, individually and in concert or conspiracy, have with deliberate or reckless indifference, stigmatized Trooper Huff with a baseless termination, using pre-textual charges arising from the sale of a state-issued pair of shoes to defer the costs of higher-quality shoes; a common practice among State Troopers and a unwritten policy Troopers are informed of in Trooper School.

5.  Defendants, individually and in concert or conspiracy, with deliberate or reckless indifference, administratively entered the pre-textual charges into Trooper Huff's personnel file and employment record, including accusations of theft on a State Property Incident Report and allegations of potential criminal action or potential misconduct sent in a report to the Criminal Justice Education and Training Standards Division; preventing Trooper Huff from finding other work as a law enforcement officer; a field Trooper Huff has worked in for over ten years, with awards and recognition for his service.

6.  As a result of Defendants' actions, Plaintiff has suffered deprivations of the rights to liberty and property guaranteed to him under the First and Fourteenth Amendments to the United States Constitution; Article I, §19 of the North Carolina Constitution; North Carolina State Law and Common Law. Plaintiff has suffered deprivation of his employment, harm to his reputation, incurred legal fees

-2-

fighting Defendants in administrative proceedings, and cannot find future employment in the field Plaintiff has dedicated his life to.

7. Moreover, as Defendants' policies, customs, and practices allow for constitutional deprivations to life and liberty, in violation of fundamental rights, Plaintiff seeks an entry of an Order and Permanent Injunction as set forth in detail below, to prevent such unjust and arbitrary actions from happening in the future.

Case 1:15-cv-00599-CCE-JEP   Document 1   Filed 07/22/15   Page 6 of 46

## JURISDICTION AND VENUE

8.   This action arises under the First and Fourteenth Amendments to the United States Constitution; Article I, §19, of the North Carolina State Constitution; as well as 42 U.S.C. §1983; and North Carolina State and Common Law.

9.   Jurisdiction is proper in this Court pursuant to 28 U.S.C. §1331, as this Plaintiff alleges complaints arising from the United States Constitution and Federal law.

10.  Supplemental Jurisdiction over state law claims are proper pursuant to 28 U.S.C. §1367(a) because they are part of the same case and controversy described by Plaintiff's federal claims.

11.  Venue is proper in the Middle District of North Carolina pursuant to 28 U.S.C. §1391, as this is the judicial district in which a substantial part of the events giving rise to the claim occurred.

## PARTIES

12.  Plaintiff, Freddie Wayne Huff, II (herein "Plaintiff" or "Trooper Huff") is a citizen and resident of Forsyth County, North Carolina.

13.  Defendant North Carolina Department of Public Safety (individually "NCDPS" and collectively "Defendants") is a state agency within the government of North Carolina, and is organized and exists pursuant to, and limited by, N.C. Gen. Stat. §143B, Articles 1 and 13, et. seq., and is empowered to sue and be sued.

14.  Defendant Division of State Highway Patrol (individually "SHP," collectively "Defendants") is a principal subunit of the Department of Public Safety organized

-4-

and exists pursuant to, and limited by, N.C. Gen. Stat. §143A-242 and N.C. Gen. Stat., Chapter 20, article 4, *et. seq.*, and is empowered to sue and be sued.

15.     Defendant Frank L. Perry (individually "Secretary Perry" and collectively "Defendants") is the Secretary of the Department of Public Safety and as such is the head of a State Department, agency or institution, pursuant to N.C. Gen. Stat §143B-600 and $20-184. Secretary Perry,  served in a supervisory and/or policy-making role for the Department and it all time relevant acted under color of state law in carrying out his duties and responsibilities. Upon information and belief, Secretary Perry is, and has been at all times relevant to this action, a citizen and resident of North Carolina.

16.     Defendant Colonel William J. Grey (individually "Colonel Grey" and collectively "Defendants") is the Commanding Officer of the Division of State Highway Patrol, and as such is the head of a state department, agency or institution, pursuant to N.C. Gen. Stat. §143B-11 and §20-185, and as such has supervisory and/or policymaking role for the SHP, and all times relevant acted under color of state law in carrying out his duties and responsibilities. Upon information and belief, Colonel Grey is and has been, and at all times relevant to this action, a citizen and resident of North Carolina.

17.     Upon information and belief, Defendant Jennifer A. Harris (individually "Major Harris" and collectively "Defendants") is the Director of the Professional Standards Division of the Division of State Highway Patrol, and as such, at all

-5-

relevant times herein, exercised supervisory authority of Plaintiff, pursuant to N.C. Gen. Stat. §143B-11 and in this capacity serves in a supervisory and/or policymaking role for the SHP, and at all times relevant, acted under color of state law in carrying out her duties and responsibilities. Upon information and belief, Major Harris is and has been, at all times relevant, a citizen and resident of North Carolina.

18.    Upon information and belief, Defendant Joseph A. Cotton (individually "Captain Cotton" and collectively "Defendants") is the Director of Internal Affairs Division of the State Highway Patrol, and as such, at all relevant times herein, exercised supervisory authority over Plaintiff, pursuant to N.C. Gen. Stat. §143B-11 and as such served in a supervisory and/or policymaking role for the SHP and at all times relevant, acted under color of state law in carrying out his duties and responsibilities. Upon information and belief, Captain Cotton is and has been, at all times relevant, a citizen and resident of North Carolina.

19.    Defendants Secretary Perry, Colonel Grey, Major Harris, and Captain Cotton are also referred collectively herein as the "Supervisory Defendants."

## ADMINISTRATIVE PROCEDURES

20.    On April 21, 2014 Petitioner Freddie Huff was terminated from employment as a Trooper with the State Highway Patrol. Plaintiff was not allowed to complete the grievance procedure described in N.C. Gen. Stat. §126 – 34.02 prior to filing in the Office of Administrative Hearings (hereinafter "OAH"). Petitioner requested

-6-

the internal grievance procedure with the North Carolina Department of Public Safety, however was denied due to allegations by the Defendants that Trooper Huff was not a career state employee.

21. On May 12, 2014, Trooper Huff filed a contested case petition with the OAH, and after several motions, Administrative Law Judge J. Randall May found on October 17, 2014, that as the internal grievance process was not completed, the OAH lacked jurisdiction to hear the case on the merits and stayed consideration until the parties completed the internal grievance process.

22. The parties completed the internal grievance process, with a Final Agency Decision issued by NCDPS Commissioner Gregory K. Baker, and approved by the Office of State Human Resources. Commissioner Baker found that Trooper Huff was not a career state employee as required for internal grievance, and reiterated the reasons the NCDPS gave for the termination. Commissioner Baker, in his decision, stated that as Trooper Huff is not a career state employee, there could be no appeal of the Commissioner's decision.

23. The case returned to the OAH, with Motions for Summary Judgment from both parties. On February 16, 2015, Administrative Law Judge J. Randall May granted NCDPS's Motion for Summary Judgment, with no stated findings of fact or conclusions of law on which to base the ruling.

24.    Trooper Huff has appealed the Final Decision Order Granting Respondent's Motion for Summary Judgment to the North Carolina Court of Appeals, however files this lawsuit in a timely manner to protect his Constitutional rights.

## FACTUAL BACKGROUND

25.    Trooper Huff worked for the Lexington (NC) Police Department from March 24, 2003 through March 5, 2013. While a Lexington Police Officer, Trooper Huff received several national awards for drug interdiction and has given training presentations for the Los Angeles Police Department, San Diego Sheriff's Office, DEA, Royal Canadian Mounted Police, and the U.S. Border Patrol on passenger and commercial vehicle criminal interdiction.

26.    While a Lexington Police Officer, Trooper Huff received mandatory training from the Federal Emergency Management Agency, to assure the Lexington Police Department received grants for the benefit of the Davidson Emergency Management Agency. This training included a class on incident management, incident command systems, and the national incident management system. This training was required for police officers to ensure federal grant-in-aid funds.

27.    Trooper Huff started with the North Carolina State Highway Patrol on March 21, 2013. During SHP training, Trooper Huff was told that the state-issued patrol shoes could be traded in at Bob's Army Navy Surplus Store in Raleigh, NC, for higher-quality Chukka boots. These boots were more expensive that the state-

issued shoes, so Troopers sell the shoes to Bob's Army Navy Surplus and pay the additional price difference for the boots.

28. Once out of Trooper School, Trooper Huff wore one pair of the state-issued shoes which fell apart. Trooper Huff decided to buy the Chukka boots to wear on duty, and offered for sale a pair of his state-issued shoes valued at $37.94 on E-Bay.

29. Trooper Huff chose not to take the shoes to Bob's Army Navy Surplus in Raleigh, as it was a two-hour drive, and he was already somewhat familiar with eBay. Trooper Huff intended the sale of shoes to defray the cost of the new, better-quality Chukka boots. However, Trooper Huff forgot to set the reserve for the auction and ended up selling the shoes for less than intended. It cost Trooper Huff more money to ship the shoes than the shoes were sold for.

30. Even though the shoes sold for less than the shipping required to deliver them, Trooper Huff shipped the shoes to the buyer, and at his own cost bought a pair of the higher-quality Chukka boots, which he then wore on patrol with the SHP.

31. In January of 2014, Trooper Huff was informed of a complaint against him, arising from an incident on January 11, 2014, in which a civilian was found driving a white Crown Victoria with a SHP "campaign" hat including a hat badge. Internal Affairs Officers Lt. Donna Carter and Sgt. Snotherly determined that Webster had recently purchased the hat from Trooper Huff on eBay.

32. Trooper Huff is an avid collector of police badges and memorabilia, and has been from the age of eighteen. Trooper Huff's badge collection alone is worth

approximately $30,000. Trooper Huff used an Ohio address on internet auctions to protect his privacy and his collection.

33.   The SHP has no policy against collecting or trading badges or other Trooper Memorabilia. There are Troopers, including some officers in Internal Affairs, who do not believe that badges or hats should be traded, as an individual should earn the right to own the insignia of the Highway Patrol.

34.   Internal Affairs reviewed Trooper Huff's eBay account history and determined Trooper Huff sold the hat in question (with hat badge), belts, cloth uniform badge, and the single pair of state-issued shoes. At this point Internal Affairs met with Trooper Huff for questioning on January 16, 2014.

35.   During questioning, Trooper Huff offered access to his eBay account so the investigators could see exactly what he sold. The investigation included a discussion about the belts Trooper Huff sold, with Trooper Huff informing Internal Affairs that the belts were not state-issued but bought off of Amazon, Trooper Huff also explained that the hat and badge were bought separately on-line, and that Trooper Huff had reconditioned the hat adding the hat badge, then sold the hat on-line. None of the items other than the shoes had been issued by the State of North Carolina.

36.   There was some confusion in the initial Internal Affairs interview regarding the shoes, as the investigators felt they asked about state-issued shoes when Trooper Huff thought they were asking about state-issued belts and uniforms. The

-10-

questions about belts and badges occurred after Trooper Huff volunteered to allow Internal Affairs to access his eBay account. Additionally, when asked directly about the shoes in the same conversation, Trooper Huff admitted to selling the shoes on-line to buy the higher-quality boots. Trooper Huff later clarified that he believed buying his own shoes and selling the state-issued shoes on eBay were the functional equivalent of exchanging the shoes at Bob's Army Navy Surplus, which he had been told in Trooper School was acceptable behavior.

37.    Immediately after his recorded interview with Internal Affairs, Trooper Huff and Lt. Carter went to Lt. Carter's computer, where Trooper Huff accessed his eBay account and allowed Lt. Carter to review his purchase and sales history, as he had offered during the interview.

38.    Trooper Huff is informed and believes at no point in the internal investigation did Internal Affairs contact Bob's Army Navy Surplus to confirm Troopers were regularly selling state-issued shoes to buy higher quality Chukka Boots, nor did Internal Affairs ask other Troopers if state-issued shoes were being sold at Bob's Army Navy Surplus.

39.    After several days, Trooper Huff learned he had been charged with a violation involving unserviceable non-exchangeable items and was told by one Captain Hayes he was not likely to be suspended though he might receive a letter of reprimand. At this point, Trooper Huff returned to full patrol duties, for approximately three more months.

-11-

40.     While on duty on approximately March 16, 2014, Trooper Huff pulled over an intoxicated driver in downtown Winston-Salem. That individual was difficult during the roadside sobriety test, and repeatedly asked Trooper Huff to give him enough time to "beat the breathalyzer" or to just let him go. At one point during the stop, the individual threatened Trooper Huff, telling Trooper Huff that the individual was a friend of the governor and that individual would have Trooper Huff's job if Trooper Huff proceeded with the stop. Trooper Huff ignored the individual's threat and charged him with Driving While Impaired after the subject failed the field sobriety test and the Intoxilyzer.

41.     On April 10, 2014, just twenty-five days after charging that politically connected individual with a DWI, Major Harris sent a report to Colonel Grey adding two additional charges to add to Trooper Huff's charge of unserviceable items. Major Harris added a violation to the SHP's Truthfulness Directive and a Violation of the SHP's Conformance to Laws Directive. In this memo, Major Harris recommends that Trooper Huff be terminated. Colonel Grey approved the Major's decision to terminate Trooper Huff.

42.     On April 21, 2014, Trooper Huff was terminated from his position with the SHP. The stated reason for the termination was Trooper Huff's sale of state-issued shoes on eBay and for allegedly being untruthful in the Internal Affairs Interview.

43.     On April 23, Captain Cotton filed a State Property Incident Report for theft, listing Trooper Huff's selling the shoes on eBay.  Lieutenant Colonel Bell filed an

-12-

Affidavit of Separation Law Enforcement Officer with the Criminal Justice
Education and Training Standards Division stating: (i) that Trooper Huff was
dismissed on April 21, 2014, (ii) the SHP was aware of an investigation
concerning potential criminal action or potential misconduct, and (iii) that Trooper
Huff sold a pair of state-issued shoes on eBay in violation of SHP Policy.

44.     After his termination, Trooper Huff contacted the Forsyth County District
Attorney's Office about  his pending cases that had not yet been to trial, and
learned that the SHP contacted the District Attorney's Office, purportedly on
behalf of Trooper Huff, and as a result the case against the politically connected
individual and approximately one hundred (100) other DWI arrests in Forsyth
County had been dismissed.

45.     In a conversation with a superior officer about the termination, Trooper Huff was
told that the decision to terminate came from higher up, outside of the Highway
Patrol. Trooper Huff is informed and believes that the order for termination came
through Secretary Perry, from the Governor's Office.

46.     Trooper Huff has been informed and believes that after his termination and as late
as June 2014, Bob's Army Navy Surplus in Raleigh, North Carolina, was still
buying state-issued shoes and selling troopers Chukka boots in exchange. Trooper
Huff is informed and believes at one point Bob's had to stop taking state-issued
shoes due to having more shoes issued to troopers than Bob's could sell.

-13-

47.     Trooper Huff filed a timely petition for a contested case hearing with the OAH.

        Defendants challenged Trooper Huff's ability to grieve, alleging that Trooper Huff

        was not a "career state employee" pursuant to N.C. Gen. Stat. §126-1.1(a)(2), as

        he did not have twenty-four (24) months of service with the SHP.

48.     Trooper Huff based his ability to file the petition on the exception granted in N.C.

        Gen. Stat. §126-5(a)(2)(d) as an "employee of an emergency management agency"

        rather than his length of service with the N.C. State Highway Patrol.

49.     N.C. Gen. Stat. §166A-19.3(9) which defines emergency management agency as a

        state or local governmental agency charged with the coordination of all emergency

        management activities for its jurisdiction.

50.     N.C. Gen. Stat. §166A-19.60, in discussing immunity and liability states that all

        "functions hereunder and all other activities relating to
        emergency management as provided for in this Chapter or
        elsewhere in the General Statutes are hereby declared to be
        governmental functions. Neither the State nor any political
        subdivision thereof, nor, except in cases of willful
        misconduct, gross negligence, or bad faith, any emergency
        management worker, firm, partnership, association, or
        corporation complying with or reasonably attempting to
        comply with this Article or any order, rule, or regulation
        promulgated pursuant to the provisions of this Article or
        pursuant to any ordinance relating to any emergency
        management measures enacted by any political subdivision of
        the State, shall be liable for the death of or injury to persons,
        or for damage to property as a result of any such activity."

51.     The definition of emergency management worker in this section includes "any full

        or part time paid, volunteer, or auxiliary employee of this State … or of any

        political subdivision thereof, or of any agency or organization performing

-14-

emergency management services at any place in this State, subject to the order or control of or pursuant to a request of the State government or any political subdivision thereof." N.C. Gen. Stat. §166A-19.60(e).

52. Trooper Huff on many occasions as a Lexington Police Officer served at the direction of the Davidson county Emergency Management Director.

53. Trooper Huff also filed for unemployment benefits, and after an extended process through the Employment Security Commission, including appeals, Appeals Referee Loyall Corey, Jr. with the Employment Security Commission found that Trooper Huff was discharged from the SHP for selling his state-issued shoes on eBay, and that the SHP had allowed others to sell state-issued shoes at Bob's Army Navy Surplus. Referee Corey concluded that Trooper Huff was not disqualified for unemployment benefits, even though the Employment Security Act states that an employee is disqualified from unemployment benefits when he is discharged for willful misconduct connected with his work. Referee Corey's decision was overturned by the Board of Review, however Referee Corey's decision that Trooper Huff was not disqualified for unemployment benefits was affirmed by a Superior Court Division in Davidson County upon judicial review.

54. Trooper Huff is informed and believes that he has not been able to find other work as a law enforcement officer due to the reasons for termination given in his separation and now a part of his employment record, to wit, dishonesty and nonconformance to laws.

-15-

## CLAIMS FOR RELIEF

### A. FIRST CLAIM FOR RELIEF: EQUAL PROTECTION
### - DISPARATE TREATMENT

55. Plaintiff re-alleges and incorporates paragraphs 1 through 54 as if fully restated herein.

56. Trooper Huff worked for Lexington Police Department for thirteen years receiving multiple Federal Emergency Management Agency certifications, and the SHP for thirteen months.

57. N.C. Gen. Stat. §166A-19.3(9) which defines emergency management agency as a state or local governmental agency charged with the coordination of all emergency management activities for its jurisdiction.

58. The definition of emergency management worker in this section includes "any full or part time paid, volunteer, or auxiliary employee of this State … or of any political subdivision thereof, or of any agency or organization performing emergency management services at any place in this State, subject to the order or control of or pursuant to a request of the State government or any political subdivision thereof." N.C. Gen. Stat. §166A-19.60(e).

59. Trooper Huff, when adding his time as a Lexington Police Officer and with the SHP, would qualify as a career state employee, with a property interest in his continued employment with the Division.

-16-

60. The right to work and earn a livelihood is a property right that cannot be taken away except under the police power of the State in the Paramount public interest for reasons of health, safety, moral, or public welfare. Damage to Trooper Huff's standing in the community by adding charges of theft or potential criminal activity into Trooper Huff's personnel record forecloses upon the freedom to continue to work in the law enforcement field, impacting his substantial interest in liberty.

61. The Equal Protection Clause of Art. I, §19 of the North Carolina Constitution and the Equal Protection Clause of §1 of the Fourteenth Amendment to the United States Constitution forbid Defendants from denying Trooper Huff the equal protection of the laws, and require all similarly situated Troopers be treated alike.

62. Article I, §1 of the North Carolina State Constitution holds all people in North Carolina to be equal, with equal inalienable rights. Article I, §§ 35-36 speaks to the fundamental principles which are absolutely necessary to preserve liberty and the protection of rights not enumerated in the Constitution. All of these Constitutional provisions protect against the deprivation of fundamental rights.

63. 42 U.S. Code §1983 allows for civil action by Trooper Huff, for violations of his civil rights under the North Carolina and United States Constitutions.

64. Trooper Huff was similarly situated to other SHP Troopers who sold their shoes to buy higher quality Chukka boots.

65. Trooper Huff was similarly situated to other SHP Troopers who made reasonable mistakes in balancing written and unwritten policies of the SHP.

-17-

66. Trooper Huff was given a different and much more severe penalty for an alleged minor infraction than similarly situated Troopers of the SHP.

67. Trooper Huff is informed and believes the disparate treatment arises from Trooper Huff charging a politically connected individual with a DWI, and North Carolina does not allow for political patronage decisions pertaining to positions that are not policy-making positions or where political affiliation is not an appropriate requirement for the position. Trooper Huff is informed and believes that he was treated differently than Troopers who have not charged politically-connected individuals with a DUI.

68. Trooper Huff performed his duties as a North Carolina State Trooper, and was not serving in a policy-making position, nor is political affiliation an appropriate requirement for the position of State Trooper, putting Trooper Huff in a class of employees protected from political patronage decisions.

69. Trooper Huff had a reasonable belief that he could sell state-issued shoes as long as funds from the sale went to buy more expensive, Chukka boots. Trooper Huff was informed in Trooper School Troopers could exchange their shoes at Bob's Army Navy Surplus for Chukka boots, with the additional cost paid for by the Troopers. Trooper Huff sold his state-issued shoes on eBay and bought a more expensive, higher-quality pair of Chukka boots.

70.    During the Internal Affairs Investigation, Trooper Huff informed Internal Affairs
       of the unwritten policy allowing for sale of the shoes, a policy he first learned of
       while training in Trooper School.

71.    Even after being informed of the unwritten policy in the internal investigation,
       Defendants did not investigate Trooper Huff's claims, as Trooper Huff is informed
       and believes no one in Internal Affairs contacted Bob's Army Navy Surplus to
       confirm that Troopers were exchanging state-issued shoes, nor is there any
       evidence Internal Affairs questioned any other Trooper as to whether they sold
       shoes to Bob's Army Navy Surplus.

72.    Trooper Huff is informed and believes that Troopers have sold their state-issued
       shoes at Bob's Army Navy Surplus to buy Chukka boots without penalty for
       misconduct, letters of reprimand, or termination; and is informed and believes the
       sale of shoes by Troopers began prior to his employment with the SHP and
       continued past his date of termination.

73.    After meeting with Internal Affairs, Trooper Huff was informed and believed he
       would receive a reprimand for selling the shoes. The only charge listed after the
       Internal Affairs interview involved unserviceable non-exchangeable items, and
       Trooper Huff continued to perform his job as a State Trooper on full duty.

74.    Approximately three months after the investigation interview with Trooper Huff,
       and only twenty-five days after stopping and charging an individual who Trooper
       Huff is informed and believes to be politically-connected, a man who threatened

                                         -19-

Trooper Huff's job through his political connections, Trooper Huff was terminated from the SHP.

75.     Trooper Huff was terminated for administrative charges arising from selling one pair of state-issued shoes worth $34.97 on eBay, to buy higher-quality, more expensive Chukka boots, which he wore on duty with the SHP, unlike similarly situated troopers who sold state-issued shoes to buy higher-quality Chukka boots.

76.     Trooper Huff's termination brought with it the additional charges added by Major Harris and approved by Commander Grey, for untruthfulness and nonconformance with laws. After his termination, Defendants either placed or ratified the placement of the allegation of theft into his employment record by filing the State Property Incident Report and alleging potential criminal action or potential misconduct in the Huff's personnel file pertaining to the eBay incident.

77.     After his termination, Trooper Huff was informed and believes that the order for termination came from outside the Highway Patrol, as it would if his termination was due to political patronage, and would constitute a departure from normal SHP procedures. Trooper Huff is informed and believes the order came "from the Dobbs Building," outside of the State Highway Patrol, and alleging that it was a political order coming through Secretary Perry's office.

78.     Trooper Huff is informed and believes that he was treated differently than the similarly situated Troopers who sold state-issued shoes at Bob's Army Navy Surplus, in that he was terminated from his position.

-20-

79.     Defendants refused Trooper Huff the ability to grieve his termination through administrative procedures until Trooper Huff filed with the Office of Administrative Affairs ("OAH"). After the contested case was put on hold to allow time for grievance, Trooper Huff was allowed to grieve his termination internally, however the SHP, the division responsible for his termination, found that termination to be for just cause. Trooper Huff is still arguing for procedural due process administratively, at his own expense.

80.     Defendants fought Trooper Huff's claims for unemployment all the way to Superior Court, where Trooper Huff, after much personal expense, was found eligible for unemployment as his discharge was not for willful misconduct.

81.     In terminating Trooper Huff for untruthfulness and non-conformance to law, Defendants have severely limited Trooper Huff's opportunities to work in law enforcement, as charges of dishonesty severely impact a law enforcement officer's reputation, stigmatizing the plaintiff.

82.     Defendants have engaged in the policy or practice of selectively enforcing regulations by disciplining Trooper Huff for the sale of state-issued shoes on the internet while allowing other similarly situated State Troopers to exchange state-issued shoes at Bob's Army Navy Surplus.

83.     The degree of discipline administered by the SHP is not reasonably related to the seriousness of Trooper Huff's infraction or supported by Trooper Huff's service record. Termination for an infraction that is not notorious, does not impact the

-21-

reputation of the SHP, and does not impact Trooper Huff's ability to do the job is unreasonable when taken into consideration that Troopers sell shoes regularly at Bob's Army Navy Surplus.

84.   The actions Trooper Huff were allegedly terminated for are not notorious, do not impact the reputation of the SHP, nor do they impact Trooper Huff's ability to do his job, and this can be seen through the fact that Trooper Huff was not taken off patrol during or after the investigation nor do other Troopers who sell shoes receive reprimand or disciplinary actions.

85.   Captain Cotton and Major Harris were, at all relevant times, responsible and involved with the Internal Affairs investigation and Major Harris recommended the additional charges and Trooper Huff's termination, while carrying out their official responsibilities for the SHP. That termination was approved by Commander Grey and Secretary Perry. Supervisory Defendants chose the charges, did an incomplete investigation of the charges, and terminated Trooper Huff under color of state law.

86.   Defendants knew or should have known an incomplete investigation could lead to an unjust termination, especially if the request to terminate came from outside of the SHP, from the Governor's Office through Secretary Perry.

87.   Trooper Huff is informed and believes that the Supervisory Defendants and other officials in the DPS and SHP had contemporaneous knowledge that Trooper Huff

-22-

was being terminated due to an order from outside the regular chain of command, and after an incomplete investigation.

88. A termination command from outside of the chain of command, after an incomplete internal investigation, is plainly obvious to a reasonable policy-maker as a violation of Trooper Huff's constitutional rights and are actions taken in bad faith.

89. The Supervisory Defendants knew or should have known about these actions and nevertheless agreed upon, or ratified by their behavior, this unconstitutional conduct.

90. As a direct and foreseeable consequence of the Defendants' actions , Trooper Huff was deprived of his constitutional right to equal protection, to

91. Defendants' incomplete investigation, an unjust and unreasonable discipline that treats Trooper Huff differently than other similarly situated Troopers, and his termination in violation of equal protection laws are direct and proximate causes of damage to the Plaintiff, in an amount in excess of $75,000, the exact amount to be determined at trial.

**B.  SECOND CLAIM FOR RELIEF:
VIOLATION OF PROCEDURAL DUE PROCESS**

92. Plaintiff re-alleges and incorporates paragraphs 1 through 91 as if fully restated herein.

93.   Trooper Huff, when adding his time as a Lexington Police Officer and with the SHP, would qualify as a career state employee, with a property interest in his continued employment with the SHP.

94.   The right to work and earn a livelihood is a property right that cannot be taken away except under the police power of the State in the Paramount public interest for reasons of health, safety, moral, or public welfare.

95.   The Law of the Land clause of Art. I, §19 of the North Carolina Constitution and the Fifth and Fourteenth Amendment to the United States Constitution provide that Defendants cannot deprive Trooper Huff of his property right in employment without the due process of Law.

96.   The addition of the State Property Incident Report for theft and the notification to the Criminal Justice Education and Training Standards Division alluding to potential criminal action or potential misconduct adds a stigma to Trooper Huff's personnel record, which forecloses upon his freedom to take advantage of other employment opportunities in the field of law enforcement and implicates Trooper Huff's liberty rights.

97.   Trooper Huff was deprived of his right to continued employment when Defendants terminated Trooper Huff from the SHP, and entered the words theft and untruthfulness into his employment record.

98.   Defendants acted in bad faith and with a deliberate or reckless indifference to Trooper Huff's procedural due process rights when the investigation was labeled

as complete and Trooper Huff was disciplined, even though Internal Affairs did not contact Bob's Army Navy Surplus to confirm other Troopers were selling state-issued shoes nor did Internal Affairs question other Troopers in the SHP about the unwritten policy allowing Troopers to sell shoes that Troopers were informed of in Trooper School.

99.  Defendants acted in bad faith and with a deliberate or reckless indifference to Trooper Huff's procedural due process rights when allowing an external source, outside of the SHP, to order Trooper Huff's disciplinary termination, outside of standard department procedures.

100.  Defendants acted in bad faith with a deliberate or reckless indifference to Trooper Huff's procedural due process rights by denying Trooper Huff the ability to grieve his termination pursuant to Defendants' argument he is not a career state employee protected from terminations without just cause.

101.  Defendants have taken repeated action to deny Trooper Huff adequate post-termination grievance procedures, arguing his status should not be the "career state employee" thus having no protection against unreasonable discipline and unjust termination.

102.  Defendants have acted in bad faith and with deliberate or reckless indifference to Trooper Huff's procedural due process rights by entering untruthfulness and theft allegations into his service record without an adequate pre-determination hearing.

-25-

103. The initial internal investigation focused solely on the sale of items on the internet, to which Trooper Huff admitted. The original items Defendants were concerned about: the "campaign" hat with badge, belt and uniform badges were found to be personal items bought and re-sold, not having been state-issued to Trooper Huff. Only the one pair of shoes were state-issued items. It was not until his termination that Trooper Huff was told of the additional charges, the charge of untruthfulness and conformance to laws.

104. The addition of this stigma in his file regarding the sale of shoes, when other similarly situated Troopers regularly sell shoes at Bob's Army Navy Surplus without discipline, without a complete investigation, also violates Trooper Huff's due process rights and stigmatizes Trooper Huff, damaging his chance at future employment in the law enforcement field.

105. Trooper Huff's termination with the additional stigma of the chosen administrative charges levied represent a deprivation of Trooper Huff's liberty rights without due process, as the administrative charges levied without a complete investigation or pre-levy hearing damage Trooper Huff's reputation by imposing the stigma of theft upon Trooper Huff, thusly damaging Trooper Huff's ability to work in the law enforcement field in the future.

106. Trooper Huff is informed and believes that the Supervisory Defendants and other officials in the DPS and SHP had contemporaneous knowledge that Trooper Huff was being terminated due to an order from outside the regular chain of command.

-26-

107. A termination command from outside of the chain of command, after an incomplete internal investigation, is plainly obvious to a reasonable policy-maker as a violation of Trooper Huff's constitutional rights and are actions in bad faith.

108. The Supervisory Defendants knew or should have known about these actions and nevertheless agreed upon, or ratified by their behavior, this unconstitutional conduct.

109. As a direct and foreseeable consequence of these policy decisions, Trooper Huff was deprived of his constitutional rights.

110. Defendants' wrongful termination in violation of Trooper Huff's procedural due process rights is a direct and proximate cause of damage to the Plaintiff, in an amount in excess of $75,000, the exact amount to be determined at trial.

### C. THIRD CLAIM FOR RELIEF: VIOLATION OF SUBSTANTIVE DUE PROCESS

111. Plaintiff re-alleges and incorporates paragraphs 1 through 110 as if fully restated herein.

112. Trooper Huff, when adding his time as a Lexington Police Officer and with the SHP, would qualify as a career state employee, with a property interest in his continued employment with the SHP.

113. The right to work and earn a livelihood is a right that cannot be taken away except under the police power of the State in the Paramount public interest for reasons of health, safety, moral, or public welfare.

114.  The Law of the Land clause of Art. I, §19 of the North Carolina Constitution and the Fifth and Fourteenth Amendment to the United States Constitution provide that Defendants cannot deprive Trooper Huff of his fundamental rights to property and liberty for an arbitrary or irrational reason.

115.  Trooper Huff was deprived of his property right to continued employment when Defendants terminated Trooper Huff from the SHP.

116.  Trooper Huff was deprived of his liberty rights to continued employment when Defendants made additional charges of untruthfulness and nonconformance to laws to his disciplinary action, and entered the sale of shoes as a theft on the state property incident forms.

117.  Defendants acted in bad faith and with a deliberate or reckless indifference to Trooper Huff's substantive due process rights when the investigation was labeled as complete and Trooper Huff was disciplined, even though Internal Affairs did not contact Bob's Army Navy Surplus to confirm other Troopers were selling state-issued shoes nor did Internal Affairs question other Troopers in the SHP about the unwritten policy allowing Troopers to sell shoes that Troopers were informed of in Trooper School.

118.  Defendants acted in bad faith and with a deliberate or reckless indifference to Trooper Huff's substantive due process rights when allowing an external source, outside of the SHP, to order Trooper Huff's disciplinary termination, which would not constitute normal SHP procedure.

119. Defendants have acted in bad faith and with deliberate or reckless indifference to Trooper Huff's substantive due process rights by entering untruthfulness and theft allegations into his service record, in utter disregard of the incomplete investigation.

120. The initial internal investigation focused solely on the sale of items on the internet, to which Trooper Huff admitted. The original items Defendants were concerned about: the "campaign" hat with badge, belt and uniform badges were found to be personal items bought and re-sold, not having been state-issued to Trooper Huff and not in violation of any policy or procedure. The only item left was the sale of shoes, which other similarly situated Troopers sold without penalty. It was not until his termination that Trooper Huff was told of the additional charges, the charge of untruthfulness and conformance to laws.

121. Trooper Huff was not suspended from the SHP after his interview with Internal Affairs, and continued working as a State Trooper up until his termination.

122. During the performance of his job duties, Trooper Huff stopped an individual for suspected driving while impaired, an individual who, upon information and belief, is politically connected and stated he would have Trooper Huff's job if he was charged with a DUI.

123. Trooper Huff has a duty to apprehend potential drunk drivers and charge those that meet the definitions of Driving While Impaired. It is the policy of the State of North Carolina to apprehend drunk drivers under N.C. Gen. Stat. §20-138.1 for

impaired driving and those found guilty of driving while impaired are convicted of a crime. Trooper Huff did his duty in accord with his job description and public policy, without thought or concern about the threats of his job arising out of the political patronage of the offender.

124.  Trooper Huff was in fact fired, less than three weeks after he was threatened with his job. Trooper Huff is informed and believes his termination was for performing his duty in apprehending the politically –connected intoxicated driver, not under the pretext given of the charges asserted by the Defendants.

125.  Trooper Huff has been informed and believes, the decision to terminate came from outside of the State Highway Patrol, outside of the regular chain of command.

126.  Trooper Huff has been informed and believes the SHP contacted Forsyth County concerning Trooper Huff's termination, leading to the dismissal of approximately one hundred (100) charges written by Trooper Huff, including the politically connected individual charged with DWI.

127.  Trooper Huff's termination, and the subsequent contact resulting in the dismissal of all those criminal charges, violates substantive due process in that terminating law enforcement officers for performing their job duties, such as stopping drunk drivers involving politically connected individuals, shocks the conscience and risks the integrity of the judicial system.

128.  Trooper Huff's termination is a retaliation of a state employee based upon political affiliation, and a violation of the First Amendment of the United States

Constitution and Art. 1, § 14 of the North Carolina Constitution protecting free speech, which safeguards state employees in non-political jobs from being terminated due to political affiliation and activities, and as such shocks the conscience and risks the integrity of the SHP.

129.    The addition of the word theft in his file regarding the sale of shoes, when other similarly situated Troopers regularly sell shoes at Bob's Army Navy Surplus, without a complete investigation, also violates Trooper Huff's substantive due process rights and stigmatizes Trooper Huff, damaging his chance at future employment in the law enforcement field.

130.    Trooper Huff's termination with the additional stigma of the chosen administrative charges levied represent a deprivation of Trooper Huff's liberty rights in violation of substantive due process, as the termination and administrative charges damage Trooper Huff's ability to work in the law enforcement field.

131.    Trooper Huff is informed and believes that the Supervisory Defendants and other officials in the DPS and SHP had contemporaneous knowledge that Trooper Huff was being terminated due to an order from outside the regular chain of command.

132.    A termination command from outside of the chain of command, after an incomplete internal investigation, is plainly obvious to a reasonable policy-maker as a violation of Trooper Huff's constitutional rights.

133.   The Supervisory Defendants knew or should have known about these actions and
       nevertheless agreed upon, or ratified by their behavior, this unconstitutional
       conduct.

134.   As a direct and foreseeable consequence of these policy decisions, Trooper Huff
       was deprived of his constitutional rights.

135.   Defendants' wrongful termination in violation of Trooper Huff's substantive due
       process rights is a direct and proximate cause of damage to the Plaintiff, in an
       amount in excess of $75,000, the exact amount to be determined at trial.

### D. FOURTH CLAIM FOR RELIEF: VIOLATIONS OF 42 U.S.C. §1983

136.   Plaintiff re-alleges and incorporates paragraphs 1 through 135 as if fully restated
       herein.

137.   The Supervisory Defendants, the SHP and DPS are "persons" as that term is used
       in the context of 42 U.S.C. §1983 for injunctive relief, and the Supervisory
       Defendants are "persons" in the context of 42 U.S.C. §1983, acting in their
       individual capacity, for compensatory and punitive relief.

138.   42 U.S.C. §1983 protects state employees who are dismissed for political reasons,
       pursuant to the First and Fourteenth Amendments to the U.S. Constitution.

139.   Plaintiff was hired by the SHP as a State Trooper with the full duties of a North
       Carolina State Trooper. Trooper Huff performed his duties as State Trooper as
       required.

-32-

140.  During the performance of his job duties, Trooper Huff stopped an individual for suspected driving while impaired, an individual who, upon information and belief, donates money to the North Carolina Governor. During the stop, the individual told Trooper Huff that he was politically-connected and he would have Trooper Huff's job if the stop continued.

141.  Trooper Huff has a duty to apprehend potential drunk drivers and charge those that meet the definitions of Driving While Impaired. It is the policy of the State of North Carolina to apprehend drunk drivers under N.C. Gen. Stat. §20-138.1 for impaired driving and those found guilty of driving while impaired are convicted of a crime. Trooper Huff did his duty in accord with his job description and public policy, without thought or concern about the threats of his job arising out of the political patronage of the offender.

142.  Trooper Huff was terminated from his position less than three weeks after he was threatened with his job. Trooper Huff is informed and believes his termination was directly related to apprehending the politically–connected intoxicated driver, not under the pretext provided by Defendants pertaining to the sale of shoes.

143.  Trooper Huff has been informed and believes, the decision to terminate Trooper Huff came from outside of the State Highway Patrol, outside of the regular chain of command, from the Governor's Office to Secretary Perry's Office.

144.  Trooper Huff has been informed and believes the SHP contacted Forsyth County concerning Trooper Huff's termination, leading to the dismissal of approximately

one hundred (100) DWI charges written by Trooper Huff, including the politically-connected individual charged with DWI.

145. Trooper Huff is informed and believes that other similarly situated troopers, troopers who sold state-issued shoes at Bob's Army Navy Surplus, were not terminated from their positions, and in fact, received no discipline at all.

146. Trooper Huff is informed and believes Defendants normal procedures include a thorough investigation of complaints against Troopers, which in this case would include contacting Bob's Army Navy Surplus to confirm Troopers are selling or exchanging shoes and asking Troopers if they sold or exchanged shoes as well.

147. Trooper Huff is informed and believes that his order for termination came from outside of the SHP, departing from normal procedure for disciplinary actions.

148. Trooper Huff was terminated less than twenty-five days after being threatened by an individual Trooper Huff is informed and believes to be a contributor to the North Carolina Governor.

149. The position of Trooper with the SHP is not a policy-making position, nor is political affiliation a reasonable or essential requirement of the job, thus qualifying for protection from political patronage dismissals.

150. Trooper Huff is informed and believes the Supervisory Defendants and other officials in the DPS and SHP had contemporaneous knowledge that Trooper Huff was being terminated due to an order from outside the regular chain of command.

-34-

151. A termination command from outside of the chain of command, after an incomplete internal investigation, is plainly obvious to a reasonable policy-maker as a violation of Trooper Huff's constitutional rights.

152. The Supervisory Defendants knew or should have known about these actions and nevertheless agreed upon, or ratified by their behavior, this unconstitutional conduct.

153. As a direct and foreseeable consequence of these policy decisions, Trooper Huff was deprived of his constitutional rights.

154. Defendants' wrongful termination in violation of Trooper Huff's Constitutional rights is a direct and proximate cause of damage to the Plaintiff, in an amount in excess of $75,000, the exact amount to be determined at trial.

### E. FIFTH CLAIM FOR RELIEF: SUPERVISORY VIOLATIONS OF 42 U.S.C. §1983 (AGAINST SUPERVISORY DEFENDANTS IN THEIR INDIVIDUAL CAPACITY)

155. Plaintiff re-alleges and incorporates paragraphs 1 through 154 as if fully restated herein.

156. The Supervisory Defendants, acting in their individual capacity, are "persons" as used in the context of 42 U.S.C. §1983 for compensatory and punitive relief.

157. 42 U.S.C. §1983 protects state employees who are dismissed for political reasons, pursuant to the First and Fourteenth Amendments to the U.S. Constitution.

158. In March and April of 2014, the Supervisory Defendants actively participated or acquiesced to an incomplete investigation regarding Trooper Huff's sale of state-

issued shoes to buy higher-quality, more expensive Chukka boots; actively participated in or acquiesced to Trooper Huff's termination with additional charges of Untruthfulness and Nonconformance to Law; and actively participated in or acquiesced to the entering of those charges or the description of Trooper Huff's activity as theft into his employment records.

159.  The Supervisory Defendants, through an incomplete investigation and acting on termination orders outside of the regular chain of commence, actions or acquiescence to those actions have evidenced a deliberate or reckless disregard for Trooper Huff's constitutional rights.

160.  As a direct and foreseeable consequence of the Supervisory Defendants' actions, Trooper Huff was deprived of his constitutional rights and suffered unjust termination, damage to his reputation, economic loss, and can no longer work in law enforcement.

161.  As a further foreseeable consequence of the Supervisory Defendants' actions, Trooper Huff was required to retain counsel and incur additional expenses to defend against the harm to his reputation.

162.  Defendants' wrongful termination in violation of 42 U.S.C. §1983 is a direct and proximate cause of damage to the Plaintiff, in an amount in excess of $75,000, the exact amount to be determined at trial.

-36-

**F. SIXTH CLAIM FOR RELIEF: CONSPIRACY IN VIOLATION OF 42 U.S.C. §1983 (AGAINST ALL DEFENDANTS, AGAINST SUPERVISORY DEFENDANTS IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES)**

163.    Plaintiff re-alleges and incorporates paragraphs 1 through 162 as if fully restated herein.

164.    The Supervisory Defendants, the SHP and DPS are "persons" as that term is used in the context of 42 U.S.C. §1983 acting in their official capacity for injunctive relief; and the Supervisory Defendants are "persons" in their individual capacity for compensatory and punitive relief.

165.    42 U.S.C. §1983 protects state employees who are dismissed for political reasons, pursuant to the First and Fourteenth Amendments to the U.S. Constitution.

166.    Under color of state law, Secretary Perry, Colonel Grey, Major Harris and Captain Cotton conspired with individuals in the Governor's Office, and entered into express and/or implied agreements, understandings or meetings of the mind, to deprive Trooper Huff of his constitutional rights by supervising or participating in an incomplete internal investigation, an unjust and unreasonable termination, and the addition of the theft, untruthfulness and nonconformance of laws allegations to Trooper Huff's employment records when Defendants knew or should have known this was not the same treatment similarly situated Troopers received.

167.    The Supervisory Defendants acted in bad faith and with deliberate or reckless disregard for Trooper Huff's constitutional rights by adhering to a termination

Case 1:15-cv-00599-CCE-JEP   Document 1   Filed 07/22/15   Page 40 of 46

order outside of the SHP chain of command, thus allowing a State Trooper to be terminated with an incomplete investigation and for political reasons.

168.   The Supervisory Defendants' actions in terminating Trooper Huff after an incomplete investigation, in violation of standard practice allowing troopers to sell state-issued shoes without reprimand or discipline, and arising from an act of political patronage to a politically-connected individual violate Trooper Huff's constitutional rights, and violating Trooper Huff's constitutional rights exceeds the bounds of Defendants' authority.

169.   As a direct and foreseeable consequence of this conspiracy, Trooper Huff was deprived of his constitutional rights and suffered unjust termination, damage to his reputation, economic loss, and can no longer work in law enforcement.

170.   Defendants' wrongful termination in violation of Trooper Huff's Constitutional rights is a direct and proximate cause of damage to the Plaintiff, in an amount in excess of $75,000, the exact amount to be determined at trial.

171.   As a further foreseeable consequence of this conspiracy, Trooper Huff was required to retain counsel and incur additional expenses to defend against the harm to his reputation.

### G. SEVENTH CLAIM FOR RELIEF:
### WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY

172.   Plaintiff re-alleges and incorporates paragraphs 1 through 171 as if fully restated herein.

173. Plaintiff was hired by the SHP as a State Trooper with the full duties of a North Carolina State Trooper. Trooper Huff performed his duties as State Trooper as required.

174. Defendants have argued in prior administrative hearings that Trooper Huff did not meet the requirements for career state employee, alleging Trooper Huff was an at-will employee.

175. Plaintiff did have a minor rule infraction regarding the sale of shoes on the internet, but was assured that he would not get in serious trouble for the infraction, possibly a letter of reprimand.

176. Trooper Huff is informed and believes that other Troopers have sold their state-issued shoes and continued to do so through at least June of 2014, at Bob's Army Navy Surplus, and have not been disciplined for misconduct arising from the sale.

177. Even after being informed of the unwritten policy in the internal investigation, Defendants did not investigate Trooper Huff's claims, as Trooper Huff is informed and believes no one in Internal Affairs contacted Bob's Army Navy Surplus to confirm that Troopers were exchanging state-issued shoes, nor is there any evidence Internal Affairs questioned any other Trooper as to whether they sold shoes to Bob's Army Navy Surplus.

178. Trooper Huff was not suspended from the SHP after his interview with Internal Affairs, and continued working as a State Trooper up until his termination.

179. During the performance of his job duties, Trooper Huff stopped an individual for suspected driving while impaired, an individual who, upon information and belief, donates money to the North Carolina Governor. During the stop, the individual told Trooper Huff that he was politically connected and he would have Trooper Huff's job if he was charged with a DUI.

180. Trooper Huff has a duty to apprehend potential drunk drivers and charge those that meet the definitions of Driving While Impaired. It is the policy of the State of North Carolina to apprehend drunk drivers under N.C. Gen. Stat. §20-138.1 for impaired driving and those found guilty of driving while impaired are convicted of a crime. Trooper Huff did his duty in accord with his job description and public policy, without thought or concern about the threats of his job arising out of the political patronage of the offender.

181. Trooper Huff was in fact fired, less than three weeks after he was threatened with his job. Trooper Huff is informed and believes his termination was for performing his duty in apprehending the politically –connected intoxicated driver, not under the pretext given of the three (3) charges asserted by the Defendants.

182. Trooper Huff has been informed and believes, the decision to terminate Trooper Huff came from outside of the State Highway Patrol, outside of the regular chain of command and outside of normal disciplinary procedure, from the Governor's Office through Secretary Perry.

183. Trooper Huff has been informed and believes the SHP contacted Forsyth County concerning Trooper Huff's termination, leading to the dismissal of approximately one hundred (100) charges written by Trooper Huff, including the politically connected individual charged with DWI.

184. Trooper Huff's termination was done in violation of valid public policy, in that terminating law enforcement officers for performing their job duties, such as stopping drunk drivers involving politically connected individuals, threatens the safety and health of the public. Law enforcement officers should not be in fear of their jobs when apprehending those that violate the law, even those with power or political connections.

185. Trooper Huff's termination, and the resulting dismissal of the approximate one hundred charges pending in Forsyth County, is in violation of valid public policy, as the State must ensure the integrity of the judicial process and enforcement of the law.

186. Trooper Huff's termination, after an incomplete investigation, on demand from a politically-connected individual, is in violation of North Carolina public policy against wrongful or retaliatory discharge of at-will employees.

187. Trooper Huff's termination is in violation of public policy disfavoring coercion of a state employee based upon political affiliation, as well as the First Amendment of the United States Constitution and Art. 1, § 14 of the North Carolina

Constitution protecting free speech, which safeguards state employees in non-political jobs from being terminated due to political affiliation and activities.

188. Defendants' wrongful termination in violation of public policy is a direct and proximate cause of damage to the Plaintiff, in an amount in excess of $75,000, the exact amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the Court grant the following to the Plaintiff:

a.    A trial by jury on all issues so triable;

b.    the issuance of an Order and Permanent Injunction ("Permanent Injunction") enjoining Defendants from terminating SHP Troopers for political patronage in violation of the Constitution;

c.    reinstatement of Plaintiff's position as a North Carolina State Trooper, with seniority and benefits he would have earned during the time missed, including back-pay for wages, with interest;

d.    damages in an amount to be established at trial against defendants in their individual capacity as compensation for constitutional deprivations, past economic loss, loss of reputation, and expenses in administrative procedures sustained as a result of Defendants' unlawful conduct ; charged jointly and severally upon the Defendants;

-42-

e.       damages in an amount to be established at trial to punish Defendants acting

in their individual capacity for the arbitrary and capricious, unjust and

unlawful conduct that recklessly and callously disregarded Plaintiff's

constitutional rights, to discourage Defendants from engaging in similar

conduct in the future, and to deter others similarly situated from engaging

in similar misconduct;

f.       the cost of this action be taxed against the Defendants;

g.       an award of reasonable attorneys' fees pursuant to 42 U.S.C. §1988(b);

h.       Such other and further relief the Court deems just and proper.


This the 21st day of July, 2015.


                         Respectfully submitted,


                         **RANDOLPH M. JAMES, P.C.**


                         By: /s/ Randolph M. James
                         Randolph M. James, N.C. State Bar No. 10,000
                         *Attorney for Plaintiff*
                         P.O. Box 20069
                         Winston-Salem, NC 27120
                         E-mail: rmjames@rmjameslaw.com
                         Telephone: (336) 724-7707
                         Facsimile: (336) 724-9722


-43-